**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| VALIANT K. LAI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>COVISINT CORP., JOHN F. SMITH, SAMUEL M. INMAN, BERNARD M. GOLDSMITH, WILLIAM O. GRABE, LAWRENCE DAVID HANSEN, ANDREAS MAI, and JONATHAN YARON,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Valiant K. Lai ("Plaintiff"), through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Covisint Corporation ("Covisint" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Covisint, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger between Covisint and Open Text Corporation ("OpenText").

2.     On June 5, 2017, the Board approved the terms of and caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"), pursuant to which the

Company's shareholders will receive $2.45 in cash for each share of Covisint stock they own (the "Merger Consideration"). The total value of the transaction is approximately $103 million (the "Proposed Transaction").

3.     On June 15, 2017, as amended on June 26, 2017, the Board authorized the filing of a materially incomplete and false and/or misleading Proxy Statement (the "Proxy" or "Proxy Statement") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  In the Proxy, the Board set forth information on which it relied to recommend that Covisint shareholders vote in favor of the Proposed Transaction. While Defendants tout the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Proxy incomplete and false and/or misleading, including information regarding (i) the process that resulted in the Proposed Transaction, (ii) the Company's internal financial projections, and (iii) the valuation analysis conducted by the Company's financial advisor, Evercore Group LLC ("Evercore"), in support of its  opinion presented to and relied on by the Board that the Proposed Transaction was fair to Covisint shareholders.

4.     As alleged in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Covisint shareholders sufficiently in advance of the July 25, 2017 vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of

the Exchange Act.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

6.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District, (ii) Covisint maintains its primary place of business in this District, (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial remuneration in this District by doing business here and engaging in activities that had an effect in this District.

## PARTIES

8.     Plaintiff is, and at all relevant times has been, a Covisint shareholder.

9.     Defendant Covisint is a corporation organized and existing under the laws of the State of Michigan with its principal place of business located at 26533 Evergreen Road, Suite 500, Southfield, Michigan 48076.

10.     Individual Defendant John F. Smith ("Smith") has served as a director of the Company and as Chairman of the Board since August 2016, when he was appointed to the Board

pursuant to the Company's cooperation agreement with Dialectic Capital Management LP ("Dialectic"), a holder of approximately 5.5% of Cotising's common stock.

11.     Individual Defendant Samuel M. Inman ("Inman") has served as a director of Covisint since January 2014 and as the Company's President and Chief Executive Officer ("CEO") since March 2014.

12.     Individual Defendant Bernard M. Goldsmith ("Goldsmith") has served as a director of Covisint since November 2012.

13.     Individual Defendant William O. Grabe ("Grabe") has served as a director of Covisint since November 2012.

14.     Individual Defendant Lawrence David Hansen ("Hansen") has served as a director of Covisint since January 2014.

15.     Individual Defendant Andreas Mai ("Mai") has served as a director of Covisint since August 2016, when he was appointed to the Board pursuant to the Company's cooperation agreement with Dialectic.

16.     Individual Defendant Jonathan Yaron ("Yaron") has served as a director of Covisint since August 2016, when he was appointed to the Board pursuant to the Company's cooperation agreement with Dialectic.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Covisint (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

18.     This action is properly maintainable as a class action because:

- 4 -

a.      The Class is so numerous that joinder of all members is impracticable.  As of June 5, 2017, there were approximately 40,865,897 shares of Covisint common shares outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Covisint will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class

would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

   f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

   g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I. The Background of the Company and the Proposed Transaction

  19. Covisint provides an open, enterprise class cloud platform that enables organizations to build solutions that identify, authenticate, and connect users, devices, applications and information. The Company's customers include large, across the globe distributed organizations and mid-sized organizations with external business relationships, as well as the participants in their business relationships. Its core customers include organizations in the automotive, energy, travel, life sciences, consumer goods, and national and regional insurance industries.

  20. Covisint was carved out of Compuware Corporation through an initial public offering in October 2013. At that time, Compuware Corporation retained approximately 82% of the outstanding shares of the Company's stock. Shortly after the initial public offering, the Company's management team conducted an extensive review of the Company's business and operations to assess the viability of the Company from an operational and profitability standpoint. As a result of this assessment and in light of disappointing annualized subscription

revenue ("ASR") bookings, in March 2014, the Company undertook a restructuring of its operations and exited substantially all of its health care subscription business and services business (the "Restructuring"). In October 2014, Compuware Corporation distributed all of the Covisint stock that it held to its shareholders.  By November 2014, the Company's stock was trading at approximately $2.50 per share.

21.     In the 2015 and 2016 fiscal years, Covisint failed to achieve its subscription revenue forecasts, causing further erosion in the market price of its stock.  On February 3, 2016, the Board held a meeting to discuss the third quarter financial results for the 2016 fiscal year and Mr. Digirolamo (the Company's CFO) recommended and the Board agreed to a reduction in guidance for subscription revenue.  During the meeting, senior management and the Board began evaluating a restructuring of its sales and marketing activities to reposition the Company for growth. Under the new strategy, the Company would focus its internal resources on a direct sales model targeted on the automotive industry.

22.     On February 4, 2016, the Company reported its 2016 third quarter fiscal financial results.  Therein, the Company noted that, while total revenue for the quarter was in line with the Company's expectations, subscription revenue had decreased by 3% year-over-year. Based on the Company's actual performance through the third quarter, the Company adjusted its guidance for subscription revenue and total revenue downward for fiscal year 2016.

23.     In the wake of this disappointing release, potential opportunistic acquirers sprung up.  Specifically, on February 11, 2016, the Company received an unsolicited written indication of interest from Company C, which proposed purchasing the Company for an all cash price of between $3.00 and $3.75 per share. On the following day, the Board held a meeting to discuss the proposal **and determined that the potential price range set forth in the indication of**

- 7 -

**interest from Company C did not adequately represent the long term prospects of the Company at that time**.

24.     However, after some of the Company's institutional shareholders began making threats, the Board reevaluated this determination.  More specifically, on May 18, 216, Roumell Asset Management LLC ("Roumell"), a significant shareholder of the Company, sent a letter to the Board – which it also publicly filed under a Schedule 13D with the SEC – in which Roumell (i) noted that the Company had been unable to grow its subscription revenue sufficiently to justify its cost structure as a public company, (ii) stated that it believed the Company should retain a banker to review the Company's strategic options, including the potential sale of the Company, and (iii) requested that the Company immediately appoint two independent directors to the Board to oversee the strategic review process.

25.     Days later, on May 21, 2016, Vector Capital ("Vector"), another significant shareholder of the Company, sent a letter to Mr. Inman – which it too publicly filed under a Schedule 13D with the SEC – in which Vector (i) noted that it agreed with the letter sent by Roumell, (ii) stated that Vector was concerned that the Company's poor financial performance, coupled with a history of losses, portended a continuing erosion of shareholder value should the Company continue under its standalone plan for the coming fiscal year, (iii) stated that it would like to pursue a take private transaction with the Company, but did not propose any offer price in its letter, and (iv) requested that the Company delay the due date for the submission of proposals to be included in the Company's annual proxy statement.

26.     On May 28, 2016, sensing blood in the water, OpenText's CEO, Mark Barrenechea, reached out to Covisint to discuss a potential acquisition.

27.     Then, on June 2, 2016, Dialectic Capital Management LP ("Dialectic"), which

held approximately 5.5% of Covisint's outstanding shares, sent a letter to the Board – which too was publicly filed under a Schedule 13D with the SEC – in which it (i) expressed concern with the Company's failure to meet certain revenue and profit targets previously released by the Company's senior management team and (ii) notified the Board that it had nominated five candidates for election at the Company's 2016 annual shareholder meeting, but also indicated that it was willing to engage in discussions with the Board regarding the Company's corporate strategy and Board composition.

28.     On the following day, in response to the public threat of terminated employment and reputational harm that would result, the Company formally engaged Evercore, the financial advisor that would ultimately render its fairness opinion in support of the Proposed Transaction, to assist in the evaluation of potential strategic alternatives available to the Company.

29.     On June 6, 2016, the Company reported its 2016 fourth quarter and full year financial results, in which it noted that, while the Company had achieved year-over-year margin improvement, its total revenue, subscription revenue and services revenue decreased by 14%, 4% and 43%, respectively, compared to the prior year. In addition, on a quarterly basis compared to the Company's prior year quarterly period, total revenue, subscription revenue and services revenue had decreased 15%, 6% and 45%, respectively. In the earnings call for the third quarter of fiscal year 2016, the Company lowered guidance for the fiscal year as a result of the Company achieving ASR or new bookings that were substantially lower than what was anticipated by the Company.  Following the earnings announcement, Defendant Inman and Mr. Digirolamo held telephone conversations with the Company's top shareholders, many of whom indicated their displeasure with the Company's poor performance and delayed earnings release and indicated that the Company should consider strategic alternatives.

30.     Capitalizing on the mounting pressure, on June 7, 2016, Company C transmitted a renewed, unsolicited indication of interest to acquire the Company was for an all cash price of between $3.00 and $3.50 per share – marking a $0.25 drop in the high end of its previous range. Company C specifically noted the Company's disappointing financial performance for the Company's fiscal year 2016, Dialectic's recent proposal to add five new members to the Board, and the unsolicited overture by Vector as its reason for submitting its updated indication of interest.

31.     On June 15, 2016, representatives of Roumell sent a second letter to the Board, reiterating Roumell's position that it wanted the Company to appoint two independent Board members and to undertake a strategic process to sell the Company.

32.     On June 24, 2016, Company C reiterated its interest in exploring a transaction with the Company at an all cash price range of $3.00 to $3.50 per share. Evercore explained that it had been engaged to explore all strategic options, and that it would contact Company C when the Company was ready to have a discussion. Company C responded that it would remain open to a friendly transaction, but that it could also take its offer directly to the Company's shareholders, if necessary.

33.     On August 3, 2016, the Board held a meeting with members of senior management, during which it reviewed the Company's first quarter results and "discussed certain matters related to the 2016 annual meeting of shareholders."  Although the Proxy is not clear, these presumably included the slate of competing directors nominated by Dialectic.  Also during this meeting, Evercore analyzed the Company's Base Case Projections (as defined below) and, as a result of this analysis, advised the Board that the market was valuing the Company in a manner comparable to SaaS companies in transition.

34.    On August 19, 2016, the Board held a telephonic meeting to discuss the terms of a "Cooperation Agreement" with Dialectic that management had negotiated with representatives of Dialectic as a result of Dialectic's June 2, 2016 letter.   On August 25, 2016, the Company entered into the Cooperation Agreement with Dialectic, pursuant to which the Company agreed to, among other things, (i) increase the size of the Board from six to nine members; (ii) appoint Individual Defendants Smith, Mai, and Yaron to the Board; (iii) cause the size of the Board to eventually reduce to seven members, effective upon the conclusion of the 2016 annual shareholder meeting; and (iv) appoint Individual Defendant Smith as Chairman of the Board and the other new directors to committees of the Board. In exchange, Dialectic agreed to standstill provisions and the termination of its proxy contest.

35.    Over the next several months, the Board proceeded with efforts to sell the Company.

36.    On November 1, 2016, the Board held a meeting with members of senior management, during which Mr. Digirolamo led the Board through the Company's results of operation for the second quarter of fiscal year 2017, and provided the Board with a **revised forecast for fiscal year 2017**. Mr. Digirolamo also discussed the Company's forward-looking plan, including cost structure, revenue forecast and expected cash balance for end of fiscal year 2017.   Thereafter, The Board directed management to adjust its guidance for fiscal year 2017 by **reducing guidance** on subscription revenue and services revenue.

37.    On November 3, 2016, the Company announced its financial results for the Company's second quarter of fiscal year 2017.   The Company lowered revenue guidance, and for the first time announced cash guidance for fiscal year 2018 and also a target that was eighteen months from the current date. Following the second quarter of fiscal year 2017 earnings

announcement, the Company's stock price decreased by approximately 11%, from a closing price per share of $2.25 on November 2, 2016 to a closing price per share of $2.00 on November 4, 2016.

38.     On November 21, 2016, the Board held a meeting with members of senior management and representatives of Evercore, during which Evercore made a presentation to the Board regarding its preliminary valuation analysis of the Company. Evercore presented a valuation analysis of the Company if it were sold in parts and an analysis of the valuation of the Company if it were sold to a single bidder. Neither presentation or a summary thereof is disclosed in the Proxy. After this presentation. the Board authorized Evercore to commence a formal, targeted sales process, which Evercore formally initiated on January 3, 2017.

39.     By February 26, 2017, Evercore had received preliminary written indications of interest from four potential buyers (Companies B, D, M, and I) ranging between $2.25 and $2.75 per share – *i.e.*, well below the previous indication of interest received by the Company in late 2016.  OpenText also indicated that it intended to submit a written indication of interest within the coming week.  Despite the fact that these indications of interest were well below past indications of interest, at the conclusion of a Board meeting held on February 26, 2017, the Board (i) instructed management to prepare Base Case Projections and Sensitized Projections (as defined below) for the Company and (ii) authorized management to continue the sales process.

40.     On March 6, 2017, OpenText submitted a written indication of interest that included an all cash price of $2.15 per share in cash (the lowest of the indications thus received) and also a request for exclusivity through April 18, 2017, with automatic successive one-week extensions to the extent OpenText was continuing to engage in negotiations with respect to a transaction. OpenText noted that this was the highest price OpenText was willing to offer for the

Company on two separate occasions.  Later, on March 20, OpenText submitted an updated written indication of interest with an all cash offer price of $2.45 per share and a request for exclusivity.

41.     On or about March 27, 2017, the Board received a copy the Base Case Projections and the Sensitized Projections for the Company, as previously requested by the Board.  During a meeting of the same date, Mr. Digirolamo presented the Base Case Projections and the Sensitized Projections to the Board and Evercore led the Board through a standalone valuation of the Company based on the Base Case Projections and the Sensitized Projections. At the conclusion of this meeting, **a minority of the members of the Board indicated that they did not favor a sale of the Company in the $2.50 range at such time and believed that the Company should either pursue a course of action for the business similar to the Sensitized Projections or other alternatives to increase profitability**, with a goal to again potentially explore strategic alternatives in twelve months.  The majority of the Board indicated that they were supportive of a sale of the Company in the $2.50 per share range, citing concerns that there was significant downside risk in the Company pursuing a course of action similar to the Sensitized Projections, including the impact such approach would have on the Company's customer base.  The Board determined to continue to move forward with the sale process.

42.     The Board held another meeting on April 1, 2017, during which revised indications of interest were discussed.  At the conclusion of this meeting, **a minority of the Board again reiterated their view that they continued to believe that the Company should pursue the Sensitized Projections or pursue other alternatives to increase profitability**.  A majority of the Board indicated that they were supportive of continuing the sale process and having Evercore engage with each of the bidders in an attempt to have them increase their bids.

- 13 -

The Board directed Evercore to request that OpenText increase its offer to $2.50 per share and to offer a three-week exclusivity period to OpenText if OpenText provided the Company with a mark-up of the merger agreement in the first week and actively conducted due diligence.

43.     By April 6, 2017, all remaining bidders (other than OpenText) had indicated that they all stood firm on their previous bids, none of which exceeded $2.35 per share.  Accordingly, the Board directed Evercore to request that OpenText promptly respond to the Company's offer of exclusivity at $2.50 per share.

44.     On April 18, 2017, the OpenText indicated that it wanted to re-engage in discussions.  On April 21, 2017, Company I contacted Evercore to follow up on the status of the sale process, noting it had been about three weeks since Evercore had last discussed the transaction with Company I.  Although the Company had not yet entered into any exclusivity agreement with OpenText, Evercore did not respond to Company I.

45.     On April 28, 2017, Evercore received an updated written indication of interest from OpenText that provided for an all cash offer of $2.45 per share.  OpenText insisted on a 30-day exclusivity period and indicated that it was not willing to increase its bid to $2.50.

46.     On April 30, 2017, the Board authorized management to grant exclusivity to OpenText, which OpenText agreed to, and expeditiously move to provide OpenText with any remaining diligence items and **execute a definitive agreement**.  The Proxy does not disclose whether this decision was unanimous or whether a minority of the Board felt otherwise.

47.     On May 3, 2017, Company I contacted Evercore to follow up on status of the sales process.  Evercore responded that no further update was available at that time.  Also on May 3, 2017, Company K submitted to Evercore a due diligence request. Evercore informed Company K that the Company had entered into exclusivity with a third party and was unable to

provide any additional information.  On May 11, 2017, Company I again contacted Evercore asking for an update on status of the process.  Evercore responded that no further update was available at that time.  On May 17, 2017, Company I again contacted Evercore asking for an update on the process.  Evercore again noted that no further updates were available at that time.  And, on May 31, 2017, Company D called contacted Evercore to inquire about the process.  Evercore noted that it was under exclusivity with a third party and was unable to provide any additional information.

48.     On June 3, 2017, the Board met to consider and vote on the Proposed Transaction.  Although the terms of the Merger Agreement was not yet finalized, each Board member had previously received a copy of Evercore's fairness opinion presentation and Evercore delivered to the Board its oral opinion that the Proposed Transaction was financially fair.  During this meeting, Defendant Mai – who voted in favor of the Proposed Transaction "to give shareholders an option to sell their shares" – also expressed his view that "there are other viable strategic alternatives to increase shareholder value at this time, including reducing expenses as part of a broader restructuring strategy, to make the Company profitable, and thereby enabling the Company to pay dividends and/or to make strategic investments in the growing IoT market."  In addition, according to the Proxy, "**each of the other members of the Board presented their respective views regarding the proposed transaction with OpenText**."  **Critically, despite the fact that a minority of the Board had previously determined on two separate occasions that they did not favor a sale of the Company in the $2.50 range, the Proxy Statement fails to disclose (i) whether these directors changed their determinations and (ii) why.**  At the conclusion of this meeting, Defendant Smith "acknowledged all views expressed by the members of the Board, and then called for a vote on the transaction, whereby the Board

**unanimously voted** to approve the transaction with OpenText."

49.     Thereafter, between June 3 and June 5, 2017, parties continued to negotiate "several remaining points on the Merger Agreement." The Proxy fails to disclose these several remaining points.

50.     On June 5, 2017, the parties executed the Merger Agreement. Also on June 5, Covisint issued a press release announcing the Proposed Transaction, which states in pertinent part:

> DETROIT, June 05, 2017 (GLOBE NEWSWIRE) -- Covisint Corporation (NASDAQ:COVS) the leading Cloud Platform for building Identity and Internet of Things (IoT) applications, today announced that it has entered into a definitive agreement to be acquired by OpenTextTM (NASDAQ:OTEX) (TSX:OTEX), the global leader in Enterprise Information Management (EIM).
>
> Under the terms of the agreement, OpenText will acquire all outstanding shares of Covisint common stock in a transaction valued at approximately $103 million. Covisint shareholders will receive $2.45 per share in cash for each outstanding share of common stock held. This transaction is compelling for Covisint shareholders, offering immediate liquidity at a substantial premium. The $2.45 per share consideration represents a 23% premium to the prior closing price on June 2, 2017, a 27% premium to the 30-day volume- weighted average price, and a 46% cash-adjusted premium(1) to the 30-day volume weighted average price.
>
> "After a comprehensive review of strategic options by our Board of Directors, we are very pleased to have reached an agreement with OpenText. We believe this all-cash transaction offers Covisint shareholders immediate liquidity and substantial certainty of value, and represents the best path forward for all of Covisint's stakeholders," said Sam Inman, Covisint's CEO. "This acquisition is a strong recognition of Covisint's leadership in Identity and IoT platforms. We are pleased that our process concluded with OpenText as our partner, and we believe they will add significant value and expertise to accelerate our growth. There is no better place for the Covisint Platform, the Covisint team members and our customers at this time in our evolution."
>
> The transaction has been unanimously approved by the Board of Directors of Covisint and is expected to close in the third quarter of calendar 2017. Consummation of the transaction is subject to customary closing conditions, including approval by holders of Covisint's common stock.
>
> Evercore is serving as financial advisor to Covisint and Paul Hastings LLP is

acting as legal counsel.

## II.    The Materially Incomplete and Misleading Proxy

51.    On June 15, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction and discloses the bases on which the Board relied to recommend and solicit votes in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### a.    Material Misstatements/Omissions Regarding the Sales Process

52.    First, as noted above, the Proxy fails to disclose certain material information regarding the process that resulted in the Proposed Transaction, including:

a.    Whether the Board's April 30, 2017 decision to authorize management to execute a merger agreement with OpenText was unanimous and whether a minority of the Board felt otherwise;

b.    Whether, on June 3, 2017, the minority of the Board that had previously determined on two separate occasions that they did not favor a sale of the Company in the $2.50 range changed their minds and, if so, why;

c.    The "several remaining points o the Merger Agreement" that were negotiated between June 3 and June 5, 2017, after the Board purportedly unanimously approved the Merger Agreement;

d.    Whether any of the 21 confidentiality agreements entered into by Covisint and its

potential acquirers contained standstill and/or "don't ask, don't waive" provisions that prevented counterparties from submitting superior offers to acquire the Company, and, if so, whether they are still in effect. Without such information, shareholders may have the mistaken belief that potentially interested parties are or were permitted to propose superior offers, when in fact they are or were contractually prohibited from doing so;

e. The nature of any post-close opportunities offered to or otherwise made available to members of the Board or Company management, and the circumstances surrounding the negotiation of the same, including the timing thereof; and

f. Whether and to what extent Evercore had performed services for Covisint or its affiliates prior to its formal engagement in June 2016, or whether Evercore ever performed services for the Company that were not in furtherance of evaluating potential strategic alternatives available to the Company.

**b.      Material Misstatements/Omissions Regarding the Company's Projections**

53.      Second, the Proxy fails to provide material information concerning the Company's financial projections. During the sale process, the Board directed Company management to prepare two sets of projections, the "Base Case Projections" and the "Sensitized Projections." Despite the abundance of references to the Sensitized Projections throughout the Proxy, including the "Reasons for the Merger" section therein, the Board directed Evercore to use and rely only on the Base Case Projections for purposes of its analyses and fairness opinion. The Base Case Projections included projections for the years 2016 to 2021 and assumed the business would continue its planned course, with a focus on automotive customers and "land and expand" growth operating scenario. The Proxy discloses that the Base Case Projections were

prepared in March 2017, and later updated in May 2017, but alleges that the May 2017 update was "immaterial."  Proxy, 47.  Only the updated, May 2017 version of the Base Case Projections is disclosed.

54.      However, as noted above, in August 2016, Evercore analyzed the Company's Base Case Projections (presumably, an earlier version than the March 2017 version), and as a result of this analysis, advised the Board that the market was valuing the Company in a manner comparable to SaaS companies in transition.   What is more, and as also noted above, on November 1, 2016, Mr. Gigirolamo provided the Board with a revised forecast for fiscal year 2017 and the Board thereafter directed management to adjust its guidance for fiscal year 2017 by reducing guidance.  Thereafter, on November 21, 2016, Evercore presented a valuation analysis of the Company if it were sold in parts and an analysis of the valuation of the Company if it were sold to a single bidder – presumably based on an earlier version of the Base Case Projections – but this analysis was never disclosed.  These earlier sets of projections – on which the Board based its decision to sell move forward with the sales process, must be disclosed.

55.      So too must the March 2017, pre-update version of the Base Case Projections be disclosed.  That is because it was based on this version of those projections that a minority of the members of the Board indicated that they did **not** favor a sale of the Company in the $2.50 range. To the extent that allegedly "immaterial" changes to the March 2017 projections changed this minority's opinion, those changes are material.

56.      In short, in order to render the multiple references to the Base Case Projections as analyzed by Evercore in August 2016 and relied on by the Board in March 2017 not misleading, the Proxy must disclose how and to what extent the August 2016 Base Case Projections and the March 2017 Base Case Projections, and their underlying inputs and assumptions, differed from

those updated by management in May 2017 and ultimately relied upon by Evercore in support of its fairness opinion.  Such information is necessary for shareholders to evaluate whether and to what extent the Base Case Projections were fair representations of the Company's value as a going concern or were manipulated in order to convince shareholders to vote in favor of the Proposed Transaction.

57.     Relatedly, the Proxy fails to disclose the presentation (or a summary thereof) by Evercore on November 21, 2016, during which Evercore presented a valuation analysis of the Company if it were sold in parts and an analysis of the valuation of the Company if it were sold to a single bidder.  The Proxy also fails to disclose the presentation (or a summary thereof) of the standalone valuation of the Company provided by Evercore on March 27, 2017, which was based on the pre-update Base Case Projections and the Sensitized Projections, and after which a minority of the members of the Board indicated that they did not favor a sale of the Company in the $2.50 range at such time.

58.     In addition, the Proxy discloses that, during the sale process, OpenText and other potential acquirers received a set of fiscal year 2018 financial projections that were identical to the same-year financial projections within the Base Case Projections. Proxy, 47. In order to render this disclosure not misleading, the Proxy must disclose whether OpenText and other potential acquirers were furnished projections for other fiscal years, and if so, whether such projections were *not* identical to the same-year financial projections within the Base Case Projections. Such information is necessary for shareholders to evaluate whether and to what extent the Base Case Projections were fair representations of the Company's value as a going concern or were manipulated in order to deter potential bidders and favor OpenText in the bidding process.

59.     With further regard to the Company's financial projections, the Proxy Statement fails to disclose: (i) unlevered free cash flow and its constituent line items; (ii) stock-based compensation expense; (iii) projected taxes; (iv) capital expenditures; (v) changes in net working capital; (vi) net income; (vii) net interest expense; (viii) income tax expense; (ix) depreciation; (x) amortization; and (xi) a reconciliation of all non-GAAP to GAAP metrics for all years of projections.

60.     In addition, though the Proxy discloses the alternative projected non-GAAP (generally accepted accounting principles) financial metric, EBITDA, it fails to provide line item projections for the metrics used to calculate this non-GAAP measure in either the Base Case Projections or Sensitized Projections. And, though the Proxy reconciles non-GAAP EBITDA to GAAP Net Income, it fails to provide such disclosures for the years 2018-2021, and also fails to disclose the extent to which such reconciliation figures were derived from the figures and assumptions underlying either the Base Case Projections, the Sensitized Projections, or some combination of both. The omission of such information renders the non-GAAP projection and the corresponding GAAP reconciliation materially incomplete and misleading.

61.     When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

**c.     Material Misstatements/Omissions Regarding Evercore's Valuation Analyses**

62.     Finally, the Proxy also omits certain key inputs necessary for shareholders to

assess the valuation analysis performed by Evercore in support of its fairness opinions, rendering the summary of such analysis in the Proxy incomplete and misleading.

63.     With respect to Evercore's Discounted Cash Flow Analysis, the Proxy fails disclose: (i) unlevered, after-tax free cash flows that the Company would generate during the period from April 1, 2017 through March 31, 2021 and the constituent line items; (ii) the assumptions underlying the discount range of 13.0% to 15.0%; (iii) Evercore's bases for applying implied perpetuity growth rates of 2.0% to 5.0% and -5.0% to -3.0%; (iv) the estimated terminal value of the Company; and (v) the adjustment made by Evercore to reflect a long0term target cost structure. This information is material to Covisint shareholders, and its omission renders the summary of Evercore's Discounted Cash Flow Analysis incomplete and misleading.

64.     With respect to Evercore's Peer Group Trading Multiples Analysis and its Precedent Transactions Analysis, the Proxy fails to disclose the individual multiples for the observed companies and transactions

65.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**On Behalf of Plaintiff and the Class Against**
**Covisint and the Individual Defendants for Violations of Section 14(a)**
**of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

67.     Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things, the process that led to the Proposed Transaction and the key inputs and assumptions of the financial analysis performed by Evercore in support of its fairness opinion.

68.     In so doing, Defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

69.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any 14D9 statement, form of 14D9, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a 14D9 for the same meeting or subject matter which has become false or misleading.

70.     During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

71.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning certain material information regarding the

process leading up to the consummation of the Merger Agreement, key inputs and assumptions underlying Evercore financial analysis, and the projections used by Evercore in that analysis.

72.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Evercore reviewed its financial analysis with the Board and that the Board considered the financial analysis provided by Evercore in its fairness opinion.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

73.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

74.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

75.     Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

76.     Because of the false and misleading statements in the Proxy, Plaintiff and the

Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Violations of Section 20(a) of the Securities Exchange Act of 1934**

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of Covisint within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Covisint, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

79.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

81.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

82.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

83.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

84.     Plaintiff has no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict. Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


July 05, 2017                    Respectfully submitted,

                                 ANTHONY L. DELUCA, PLC

                                 *Anthony L. DeLuca*
                                 Anthony L. DeLuca (P64874)
                                 14950 East Jefferson Avenue, Suite 170
                                 Grosse Pointe Park, MI 48230
                                 (313) 821-5905
                                 *anthony@aldplc.com*

**OF COUNSEL:**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
206 Covington Street
Madisonville, LA 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com

*Attorneys for Plaintiff*